UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES *ex rel.* MICHAEL T.
GREER

              PLAINTIFF/RELATOR,

v.

DYNCORP INTERNATIONAL, INC.
3190 Fairview Park Drive, Suite 700
Falls Church, VA 22043

Serve Also Statutory Agent:
Corporation Service Company
2711 Centerville Road
Wilmington, Delaware

and

DYNCORP INTERNATIONAL LLC
3190 Fairview Park Drive, Suite 700
Falls Church, VA 22043

Serve Also Statutory Agent:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

and

Case No.

(Judge  )

COMPLAINT AND JURY DEMAND
[FILED UNDER SEAL]

DO NOT SERVE

**DELTA TUCKER HOLDINGS, INC.**
**3190 Fairview Park Dr., Suite 700**
**Falls Church, VA 22042**

**Serve Also Statutory Agent:**
**Corporation Trust Company**
**Corporation Trust Center**
**1209 Orange Street**
**Wilmington, Delaware 19801**

**and**

**DELTA TUCKER SUB, INC.**
**299 Park Avenue**
**New York, NY 10171**

**Serve Also Statutory Agent:**
**Corporation Service Company**
**2711 Centerville Road, Suite 400**
**Wilmington, DE 19808**

**and**

**ONSITE OHS, INC.**
**101 N. Hart Street**
**Princeton, Indiana 47670**

**Serve Also Statutory Agent:**
**Kyle Johnson**
**7517 E. 450 N.**
**Francisco, Indiana 47649**

## DEFENDANTS.

This is an action by qui tam Relator Michael T. Greer ("Relator"), through the undersigned counsel, made on behalf of himself and the United States of America ("United States") to recover damages and penalties arising from Defendants DynCorp International, Inc., DynCorp International LLC, Delta Tucker Holdings, Inc., Delta Tucker Sub, Inc. (collectively, "DynCorp") and Onsite OHS, Inc. ("Onsite OHS") using, making, and/or presenting false

statements and claims to the Department of Defense ("DOD"), United States Army (the "Army"), and other government agencies in violation of the False Claims Act, 31 U.S.C. §3729 *et. seq.* Defendants have wrongfully obtained substantial funds through their false statements and/or claims concerning payments and/or reimbursements they receive from the DOD, Army and other government agencies for the performance of certain duties and obligations under the LOGCAP IV contract that were never performed, including fit for duty medical and dental examinations, the purchase of medical equipment, provisions for adequate medical resources, salaries paid to not fit for duty and/or unqualified DynCorp personnel, and the timely construction of physical exam centers, as well as services and resources fraudulently provided to other non-LOGCAP contracts.

Under the terms of the False Claims Act, this Complaint is to be filed in camera and under seal and is to remain under seal for a period of at least sixty days and shall not be served on any of the Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within the sixty-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the Material Evidence submitted to it.

For his cause of action, the Relator alleges as follows:

## NATURE OF ACTION

1.     This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§3729-3733.

2.     Under the False Claims Act, a private person may bring an action in federal district court for himself and the United States, and may share in any recovery.  31 U.S.C.

§3730(b).  That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## JURISDICTION

3.    This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§1331 and 1345.

4.    The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a) because at least one of the Defendants transacts and has transacted business in this District.  Relator alleges that the Defendants have conspired and taken action in furtherance of the conspiracy within the United States such that, among other reasons, this Court has jurisdiction over all Defendants in this action.

## VENUE

5.    Venue is proper in this District under 31 U.S.C. §3732 and 28 U.S.C. §1391(b) and (c) because at least one of the Defendants transacts business in this District.

## PARTIES

6.    The Relator brings this action on behalf of the United States, including the Department of Defense, the United States Army and other government agencies.

7.    The Relator also brings this action on behalf of himself as permitted under the False Claims Act.  Relator Michael Greer is a citizen of the United States.  Michael Greer has direct and independent knowledge, within the meaning of 31 U.S.C § 3730(e)(4)(B), of the information on which the allegations set forth in this Complaint are based.  Michael Greer is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B).  Michael Greer has knowledge of the false claims and/or payments Defendants knowingly, falsely and fraudulently submitted and/or received from the federal government as alleged herein.

4

8.     Defendant DynCorp International, Inc. is a corporation organized under the laws of the State of Delaware.   In 2010, DynCorp International, Inc. was acquired by Defendant Delta Tucker Holdings, Inc. through a merger with Defendant Delta Tucker Sub, Inc.   DynCorp International, Inc.'s principal place of business is 3190 Fairview Park Drive, Suite 700, Falls Church, Virginia 22042.   DynCorp International, Inc. is a U.S. national security contractor and DynCorp International, Inc.'s primary business is support of the Departments of Defense and State through the provision of linguistic services, international police force training, and post-conflict infrastructure development services.   Upon information and belief, almost 98% of DynCorp International, Inc.'s revenue is generated from contracts with the United States government.   DynCorp International, Inc. reported annual sales of approximately $845 million in 2011.

9.     Defendant DynCorp International LLC is a Delaware corporation with a principal place of business at 3190 Fairview Drive, Suite 700, Falls Church, VA 22042.   Defendant DynCorp International LLC is a wholly owned subsidiary of Defendant DynCorp International, Inc.   Upon information and belief, DynCorp International LLC is the named contracting party in DynCorp's LOGCAP IV federal government contract.

10.     Defendant Delta Tucker Holdings, Inc. is a Delaware corporation with a principal place of business at 3190 Fairview Drive, Suite 700, Falls Church, VA 22042.   Defendant Delta Tucker Holdings, Inc. provides mission-critical specialized and support services to the United States military and other governmental agencies and to foreign governments.   Revenue from contracts with the United States government has accounted for at least 98% of Defendant Delta Tucker Holdings, Inc.'s total revenue since its inception in 2009.

11.     Defendant Delta Tucker Sub, Inc. is a Delaware corporation and wholly-owned subsidiary of Delta Tucker Holdings, Inc. with a principal place of business at 299 Park Avenue, New York, New York, 10171.

12.     On or about July 7 2010, Defendant DynCorp International, Inc. completed its merger with Defendant Delta Tucker Sub, Inc. (the "Merger"). Pursuant to the Merger agreement, Defendant Delta Tucker Sub, Inc. merged into Defendant DynCorp International, Inc. Defendant DynCorp International, Inc. was the surviving corporation in the Merger and became a wholly-owned subsidiary of Defendant Delta Tucker Holdings, Inc. Upon information and belief, the Merger was a reverse triangular merger whereby Defendant Delta Tucker Holdings, Inc. assumed all of the liabilities of Defendant DynCorp International, Inc. Defendants Delta Tucker Holdings, Inc. and Delta Tucker Sub, Inc. are entities created on behalf of affiliated funds and/or managed accounts of Cerberus Capital Management, L.P., a private investment firm organized under the laws of the state of Delaware.

13.     Defendants DynCorp International, Inc., DynCorp International LLC, Delta Tucker Holdings, Inc., and Delta Tucker Sub, Inc. will be collectively referred to hereafter as "DynCorp."

14.     Defendant Onsite OHS is organized under the laws of the state of Indiana and has a principal place of business at 101 N. Hart Street, Princeton, Indiana, 47670. Onsite OHS provides medical services and medical support in the United States and internationally. Onsite OHS has contracted with Defendant DynCorp to provide medical services to DynCorp civilian contract employees as a subcontractor under the LOGCAP IV contract. Onsite OHS's revenue exceeds $19 million annually. Defendant Onsite OHS's contract with Defendant DynCorp

requires it to perform annual physical examinations on all DynCorp civilian contract employees to ensure that they are fit for duty.

## LOGCAP IV AND ASSOCIATED TASK ORDERS

15.    The United States Army's Logistics Civil Augmentation Program IV (LOGCAP IV) provides military logistics support through the services of civilian contracts and is a continuation of the military's LOGCAP program.

16.    Each LOGCAP IV contract is awarded as an Indefinite Quantity/Indefinite Delivery (IQID) contract that provides for one base year and nine option years. Each LOGCAP IV contract has a maximum value of $5 billion per year.

17.    LOGCAP IV utilizes contracts with private sector companies to provide planning support and performance functions to support United States and allied combat, peacekeeping, humanitarian, and training operations. The services provided under LOGCAP IV include supply operations (delivery of food, water, fuel, spare parts, and other items), field operations (dining and laundry facilities, housing, sanitation, waste management, postal services, and morale, welfare, and recreation facilities), and other operations (engineering, construction, support to communication networks, transportation and cargo services, and facilities maintenance and repair).

18.    LOGCAP IV calls for multiple contractors to deliver services. In 2007, DynCorp was selected as one of three companies approved to submit bid proposals for specific task orders under LOGCAP IV. DynCorp's LOGCAP IV Contract No. is W52P1J-07-D-0007 ("LOGCAP IV contract").

19.    DynCorp has been awarded at least four task orders.

20.     In or around February 2009, DynCorp was awarded a task order for support of the Udairi Army Airfield in Kuwait ("Task Order 3") under the LOGCAP IV contract.  Task Order 3 was valued at $20.8 million for a one-year transitional period and for up to an additional four years the options may be awarded at the discretion of the government.  Task Order 3 requires DynCorp to provide support services at the Udairi Army Airfield including firefighting, fire protection support, equipment, and vehicle maintenance, airfield operations, flight dispatch, air traffic control tower services, and weather observation and forecasting services.

21.     In or around July 2009, DynCorp was awarded a task order for logistics support for the Afghanistan-South Area of Responsibility (AOR) under the LOGCAP IV contract ("Task Order 4").  Task Order 4 was valued at $643.5 million for a one-year base period and included four one-year options with a total value of $5.874 billion.  Task Order 4 requires DynCorp to provide operations and maintenance support for facilities management, electrical power, water, sewage and waste management, laundry operations, food services, and transportation motor pool operations.  This task order covers 50 LOGCAP-supported bases in Afghanistan.

22.     Onsite OHS was awarded subcontracts and task orders to provide medical personnel and services to support DynCorp in Kuwait and in the Afghanistan-South Area of Responsibility under Task Orders 3 and 4, respectively, of DynCorp's existing LOGCAP IV contract.

**REGULATIONS AND REQUIREMENTS FOR LOGCAP IV CONTRACTORS**

23.     The United States Central Command (CENTCOM) supports and promotes cooperation among nations, responds to crises, and deters or defeats state or non-state aggression, and supports development and reconstruction in the "central" area of the globe, including the countries of Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Kazakhstan, Kuwait,

Kyrgystan, Lebanon, Oman, Pakistan, Qatar, Saudi Arabia, Syria, Tajikistan, Turkmenistan, United Arab Emirates, Uzbekistan, and Yemen.

24.     Civilian Contractor Employees deploying to CENTCOM areas must meet the medical standards set forth by the Department of the Army Personnel Policy Guidance for Overseas Contingency Operations (the "Army Personnel Policy").

25.     The Army Personnel Policy requires that "[a]ll personnel . . . deploying to theater must be medically (to include dental) and psychologically fit for deployment." *See* Army Personnel Policy at §7-9(a).

26.     With respect to Contractor Employees, the Army Personnel Policy provides: "Contractor employees must be documented to be fit for the performance of their duties by a medical and dental evaluation prior to deployment. . . Contractors will obtain and utilize the standards of fitness and the supported command's medical authority." *See Id.* at §7-9(d).

27.     Civilian Contractor Employees deploying to CENTCOM areas of responsibility must additionally meet the medical requirements outlined in MOD 11 to the CENTCOM, United States Commander in Chief, United States Central Command ("USCINCCENT") Individual Protection and Individual/Unit Deployment Policy ("MOD 11") and Tab A to MOD 11, Amplification of the Minimal Standards of Fitness for Deployment to the CENTCOM AOR ("Tab A").

28.     MOD 11 expressly applies to "military personnel, DOD civilians, DOD contractors, all host nation (HN), local national (LN), and third country nationals (TCN), and volunteers traveling or deploying to the CENTCOM AOR." *See* MOD 11 at §15.B.

29.     Under MOD 11, "[a]ll personnel (uniformed service members, government civilian employees, DOD contractor employees, and volunteers) travelling to theater must be

medically (to include dental) and psychologically fit for deployment." *See Id.* at §15.C.2.B.  As such, all personnel deploying to theater must "possess a current Periodic Health Assessment (PHA) or physical." *See* Tab A at ¶6.

30.     DOD contractors are required to provide the medical and dental evaluations required by MOD 11. *See* MOD 11 at §15.C.2.E.1.

31.     Employees of contractors must meet the same standards for fitness as other military and DOD civilian personnel and "must be documented to be fit for the performance of their duties without limitations by a medical and dental evaluation prior to deployment." *See* MOD 11 at §15.C.2.E.

32.     MOD 11 further provides that "government civilian employees, volunteers, and DOD contractor personnel, who deploy for multiple tours, for more than 12 months total, must be re-evaluated for fitness to deploy." *See* §15.C.2.C.

33.     Valid examinations with all medical issues and requirements addressed are good for 15 months from the date of the physical examination. *See Id.* at §15.C.2.C.

34.     Thus, DOD contractors are responsible for evaluating not only the pre-deployment fitness for duty of each DOD Contractor Employee, but also for ensuring that all contractors are fit for duty by providing annual medical and dental evaluations to their employees during deployment. *See Id.* at §15.C.2.E.1; *see also* Tab A at ¶6 (DOD contract employees must "possess a current periodic health assessment (PHA) or physical").

35.     Any and all personnel (military, civilian and contractor) not meeting the CENTCOM requirements are not eligible for deployment or to work in theater. *See Id.* at §15.C.

36.     "All personnel (military, civilian and contractor) will be medically evaluated and if deemed unable to comply with CENTCOM deployment requirements on a continuing basis, disqualified for deployment IAW Service Policy and MOD 11." *Id.*

37.     Personnel found non-deployable while outside the theater may not enter or re-enter the theater. *Id.*

38.     The LOGCAP IV contract entered into between the United States Army and DynCorp expressly requires that "[t]he contractor will ensure that all deployable employees are medically and physically fit to endure the rigors of deployment in support of a military operation." Contract at §H-18(3). The LOGCAP IV contract also requires that all deploying contractor employees meet minimum medical screening requirements. *Id.* at §I-3110(e)(1)(ii).

39.     By employing contractor employees in theater, therefore, DOD contractors certify that they and their contractor employees have met the requirements for fitness for duty included in MOD 11, Tab A, and the Army Personnel Policy. *See U.S. v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C.Cir. 2010).

40.     By submitting claims to the United States government for payment, all LOGCAP IV contractors certify that their employees have met, and continue to meet, the requirements of MOD 11, Tab A, and the Army Personnel Policy, including the requirement that all civilian contractor employees are fit for duty.

## FACTUAL ALLEGATIONS

41.     From at least 2009 through the present, Defendants have knowingly engaged in systemic false and fraudulent schemes to defraud the federal government out of millions of dollars.

42.     Any and all allegations relating to contract requirements of DynCorp's LOGCAP IV contract relate to both Task Orders 3 and 4. All of the factual allegations contained hereafter in this Complaint relate to Task Order 4; if any factual allegations also relate to Task Order 3, that Task Order will be expressly identified.

43.     Relator, Michael Greer, was employed by Defendant Onsite OHS, subcontractor for Defendant DynCorp under the LOGCAP IV contract, as both a medic and deputy project manager for all healthcare services provided to DynCorp employees in southern Afghanistan under Task Order 4, including the provision of fit for duty annual medical examinations, from June 2011 to the present.

44.     Currently as a medic for Defendant Onsite OHS, Relator provides services to DynCorp employees on a military base in southern Afghanistan. In this position, Relator provides safety and medical services to DynCorp civilian contract employees under the LOGCAP IV service contract, including fit for duty medical examinations. Relator also cares for ill and injured patients. In addition, Relator is responsible for extensive record keeping and record management activities, including development of an employee database that allows for rapid access to all medical and immunization records of DynCorp civilian contract employees.

45.     Previously, Relator served as deputy project manager for Defendant Onsite OHS. In this role, Relator supervised and directed Onsite OHS employees who provide healthcare services to civilian contract employees of Defendant DynCorp in southern Afghanistan. Relator directly supervised Onsite OHS employees and provided oversight for administrative functions at several Onsite OHS regional branch locations in southern Afghanistan. Relator's job responsibilities included ensuring that all branch locations had adequate administrative support to allow them to gather and report medical data for DynCorp civilian contract employees in a

consistent and appropriate manner. Relator provided communication and reports about the administrative functions, including record keeping and data management, from all Onsite OHS branch locations directly to Onsite OHS senior management. Relator also trained Onsite OHS employees on maintaining standards of care throughout Onsite OHS.

46.     During the course of his employment, Relator discovered that Defendants were involved in an ongoing scheme of defrauding the federal government. Relator was directly involved in administrative and records management tasks for Task Order 4 that involved DynCorp and Onsite OHS's records of employees who did not possess current fit for duty examinations. For example, in 2012 Relator was directly responsible for creating and maintaining a database of DynCorp contractor employees who did not have current fit for duty examinations.

47.     Defendants DynCorp and Onsite OHS have been knowingly submitting false claims for payment to, and/or receiving payments from, the government as a result of fraudulent schemes, including but not limited to:  (1) fraudulently receiving payment from the government since 2009 under Task Orders 3 and 4 of DynCorp's LOGCAP IV contract for annual fit for duty medical examinations of contractor employees that were never provided; (2) fraudulently receiving payment from the government for medical equipment, resources and the construction of medical physical exam centers that were never provided; (3) submitting false claims for payment of salaries to contractor employees who are not fit for duty under Task Orders 3 and 4; (4) submitting false claims for payment of salaries to personnel to provide CPR and first aid services to civilian contractor employees when they have not been trained in that capacity and have thus not provided those services from 2009 to the present; and (5) fraudulently providing

services and resources to other non-LOGCAP contracts while falsely submitting claims for payment to the government under the DynCorp LOGCAP IV contract umbrella.

### Fraudulently Receiving Payments from the Government for Annual Fit for Duty Medical Examinations and Medical Equipment, Resources and Physical Exam Centers Never Provided

48.     Pursuant to provision H-14 of Defendant DynCorp's LOGCAP IV contract with the government: "The contractor [DynCorp] shall ensure compliance with all contract requirements. An election to perform by subcontract (at any tier) or otherwise does not relieve the prime contractor of its responsibilities to ensure compliance."

49.     As part of the LOGCAP IV contract, DynCorp was to provide, among other things, medical examinations to its employees and then certify that the employees were fit for duty as a condition of deployment to, or remaining in, the field (aka theater) in Kuwait and southern Afghanistan.

50.     Provision H-18(3) of the LOGCAP IV contract specifically states: "The contractor [DynCorp] will ensure that all deployable employees are medically and physically fit to endure the rigors of deployment in support of a military operation. If an employee is unable to perform, the contractor must replace the employee."

51.     Provision I-311(e) further states: "Pre-deployment requirements.    (1) The Contractor [DynCorp] shall ensure that the following requirements are met prior to deploying personnel in support of U.S. Armed Forces. Specific requirements for each category may be specified in the statement of work or elsewhere in the contract . . . (ii) All deploying personnel meet the minimum medical screening requirements and have received all required immunizations as specified in the contract."

52.    The medical screening requirements that must be met for all civilian contractor employees deploying to CENTCOM areas are set forth in the Army Personnel Policy, MOD 11 and Tab A to MOD 11.  In summary, these policies require, among other things, that:

(a)    All personnel deploying or travelling to theater must be medically (to include dental) and physically fit for deployment.  Army Personnel Policy §§7-9(a), (d); MOD 11 §15.C.2.B;

(b)    Contractors are required to provide the medical and dental evaluations required.  MOD 11 §15.C.2.E.1;

(c)    "Government civilian employees, volunteers, and DOD contractor personnel, who deploy for multiple tours, for more than 12 months total, must be re-evaluated for fitness to deploy . . .**An examination with all medical issues and requirements addressed will remain valid for 15 months from the date of the physical.**" MOD 11 §15.C.2.C (emphasis in original text); and

(d)    "All personnel (military, civilian and contractor) will be medically evaluated and if deemed unable to comply with CENTCOM deployment requirements on a continuing basis, disqualified for deployment IAW service policy and MOD 11."  MOD 11 §15.C.

53.    Upon commencement of Task Orders 3 and 4 of the LOGCAP IV contract in 2009, DynCorp employed tens of thousands of civilian personnel in Kuwait and southern Afghanistan to provide services under the contract, each of which were required to be medically and psychologically fit for duty determined by medical and dental examinations to be conducted pre-deployment and annually (with only a 3 month grace period).

54.     In late 2009, DynCorp hired a subcontractor, Defendant Onsite OHS, to provide medical services to its personnel, including the annual fit for duty examinations, under Task Orders 3 and 4.

55.     DynCorp negotiated with the government annually as to the amount of money to be paid to DynCorp to provide the necessary services under Task Orders 3 and 4, which included the money to be paid DynCorp to conduct these medical and dental examinations and included money for medical resources, equipment and the construction of medical physical exam centers.

56.     Upon information and belief, DynCorp's annual contract negotiations with the government resulted in a determination that the fit for duty examinations, plus the amounts for medical resources, would cost DynCorp more than approximately $1,000 per contract employee annually and this total amount was then figured into the annual contract payments DynCorp would receive from the government under Task Orders 3 and 4.

57.     In turn, Onsite OHS negotiated its subcontracts (or scopes of work) with DynCorp on an annual basis for the amount it would be paid to provide medical services to DynCorp employees, including fit for duty examinations, under both Task Orders 3 and 4.

58.     Defendants DynCorp and Onsite OHS, however, failed to perform the majority of fit for duty medical examinations (other than on food personnel) for over three years under either Task Order, yet were fraudulently paid by the government to do so.

59.     In addition, because numerous personnel were transferred from other non-LOGCAP contracts to provide services under DynCorp's LOGCAP IV contract, they were also required to obtain pre-deployment medical examinations (including dental) prior to providing services under the LOGCAP IV contract.  Upon information and belief, Defendants DynCorp and Onsite OHS also failed to perform many of these fit for duty "transition" or pre-deployment

medical examinations in violation of the terms of their LOGCAP IV contract, the Army Personnel Policy and MOD 11, and thus DynCorp employed hundreds, if not thousands, of not fit for duty employees from the onset of Task Orders 3 and 4 of the LOGCAP IV contract in 2009 and were fraudulently paid by the government to perform the pre-deployment medical examinations on these employees.

60.     Not only were fit for duty examinations not being conducted on DynCorp's tens of thousands of civilian employees since the onset of the LOGCAP IV contract in 2009, but DynCorp knew that Onsite OHS was not conducting the examinations.

61.     In addition, under Task Order 4, DynCorp failed to provide sufficient resources and medical personnel to Onsite OHS to complete the examinations and instructed Onsite OHS to conspire to hide DynCorp's knowing and fraudulent violations of the terms of its LOGCAP IV contract, the Army Personnel Policy, and MOD 11.

62.     Since 2009, Onsite OHS repeatedly informed DynCorp that these fit for duty examinations under Task Order 4 have not been performed and that it lacked both the personnel and equipment to conduct the required examinations.

63.     In fact, during one key email exchange, Onsite OHS provided spreadsheets identifying the personnel that had fallen to not fit for duty status and sent this information to DynCorp management in emails where the subject line read "Re: AWARENESS – Employees Not Fit For Duty Due to Medical Service Requirements."     In reply, DynCorp executives/managers instructed Onsite OHS to immediately change the title of these emails because if the wrong person saw them, DynCorp would get in "a hell of a lot of trouble" because DynCorp was being paid by the government for services provided by these not fit for duty personnel every month.  Therefore, in an effort to try to conceal the fraudulent scheme, Onsite

OHS conspired with DynCorp and changed the title of all future emails to read "Re: Employees required at OHS clinic for Medical Services."

64.     Onsite OHS also provided DynCorp management with "Course of Action" briefs that detailed the amount of physicals overdue (over 6,000 in early 2012), the amount of physicals that continued to come overdue each month (between 200-1,000 per month during the years 2011-2012), and the resources needed by Onsite OHS to complete the overdue medical examinations.

65.     DynCorp, however, continued to knowingly and fraudulently violate its LOGCAP IV contract and failed to provide Onsite OHS with the necessary resources to conduct the fit for duty examinations.

66.     For example, DynCorp was paid by the government to construct a second medical physical exam center in Afghanistan in 2009 in order for Onsite OHS to perform the required number of fit for duty medical examinations to be performed annually, but did not even construct that exam center until late 2012.

67.     On one occasion, Onsite OHS suggested that a mobile medic team be developed to perform the medical examinations in southern Afghanistan. DynCorp put in a purchase order for a $100,000 mobile x-ray machine for this team, which was approved, but DynCorp never purchased the equipment and instead fraudulently used the money for other purposes.

68.     In addition, with knowledge that Onsite OHS lacked enough medical personnel to even perform the overdue fit for duty medical examinations, DynCorp pushed Onsite OHS to reduce its medical team personnel in June/July 2012.

69.     DynCorp's own risk department notified DynCorp executive/managers of its continued violations of its LOGCAP IV contract and MOD 11 in risk registers. Specifically,

these risk registers detailed the following violations that were communicated to DynCorp management:

(a)   "DI [DynCorp International] is either not performing and/or significantly backlogged in the performance of required redeployment and demobilization medical examinations of DI employees and subcontractors (Host County National employee excluded) which is a failure to comply with the Base Contract and MOD 11; resulting in a possibility of DI not meeting contractual requirement and personnel unfit for duty, impacting project performance."

(b)   "DI is either not performing and/or significantly backlogged in the performance of required annual employment medical screening and annual physical examinations for DI Host County National employees which is a failure to comply with the Base Contract and MOD 11; resulting in the possibility of an endemic outbreak which would negatively impact project performance."

70.   Furthermore, DynCorp's own management actively participated in the fraudulent scheme themselves by fraudulently signing-off on each other's medical forms. For instance, before a DynCorp manager could leave or reenter theater, they needed proof of current medical examinations and certificates. Because even DynCorp managers were not current on their annual medical examinations and thus not fit for duty, they falsified the paperwork by having DynCorp co-workers falsely certify that the medical examinations were conducted and current.

71.   It was not until late 2012 that DynCorp and Onsite OHS even began performing most of the overdue fit for duty medical examinations under either Task Orders 3 or 4. However, these recent examinations are not even valid because no dental examination has been

performed on any contractor employee as required by DynCorp's LOGCAP IV contract, the Army Personnel Policy and MOD 11.

72.     In fact, because no dental examinations have been performed on any of DynCorp's tens of thousands of employees during their annual fit for duty examinations under Task Orders 3 and 4 of the LOGCAP IV contract, the few examinations that were performed prior to late 2012 are also invalid and those employees are not fit for duty.

73.     DynCorp management has knowledge of these continued contract and policy violations.  In a recent email from Ken Murphy, DynCorp's director of medical services, Mr. Murphy emphatically stated that a dental exam is and always has been a part of the requirement for pre-deployment and annual fit for duty medical examinations.

74.     However, not a single annual dental examination has ever been provided to any DynCorp employee/personnel and still has not to date.  In fact, DynCorp refuses to purchase the needed equipment to provide these dental examinations due to cost and has not even agreed to hire a dentist.

75.     Thus, despite DynCorp's recent attempt in late 2012 to begin conducting more fit for duty medical examinations so as not to be caught by the government for its ever-growing population of not fit for duty personnel and therefore continued contract violations, none of the medical examinations conducted under Task Orders 3 or 4 even meet the minimum requirements laid out in DynCorp's contract with the government, the Army Personnel Policy or MOD 11, and thus are not valid.

76.     DynCorp, however, continues to knowingly, falsely and fraudulently certify to the government every year that its employees are fit for duty and current on their medical examinations in compliance with the LOCGAP IV contract, Army Personnel Policy and MOD

11, and thus has been overpaid millions of dollars by the government for services not rendered under Task Orders 3 and 4.

77.     Since 2009, upper management of Onsite OHS has had knowledge of DynCorp's fraudulent activity and false submissions for payment and not only did not report this fraudulent conduct to the government, but also conspired with DynCorp to conceal the fraudulent scheme. Furthermore, despite the fact that Onsite OHS was not performing most of the medical examinations required by their own subcontract with DynCorp until late 2012, Onsite OHS received payment from DynCorp under Task Orders 3 and 4 of the LOGCAP IV contract with the government for services not rendered.

### Fraudulently Submitting Claims to the Government for Payment of Salaries to Contractor Employees who are Not Fit for Duty and/or Personnel Not Trained to Provide Medical Services

78.     Defendants DynCorp and Onsite OHS have been knowingly, falsely and fraudulently submitting claims for payment to, and/or receiving payments from, the government under Task Orders 3 and 4 for salaries to contractor employees who are not fit for duty and under Task Order 4 for personnel lacking the medical training required under their job descriptions in direct violation of the LOGCAP IV contract and MOD 11.

79.     Section H-18(3) of the LOGCAP IV contract and MOD 11 §15.C make clear that any and all personnel (military, civilian and contractor) who are not fit for duty are disqualified from deployment and must be removed from theater and replaced.

80.     Accordingly, personnel who are not fit for duty not only must be removed/terminated, but they are also not eligible for salaries or payments under the LOGCAP IV contract.

81.     Defendants DynCorp and Onsite OHS, however, have not only not removed anyone from theater who is not fit for duty because they failed to receive their annual examinations, but are fraudulently submitting monthly claims for payment from the government for, and have paid monthly salaries to, thousands of personnel who are not fit for duty since 2009 and continuing through the present under Task Orders 3 and 4.

82.     Thus, Defendants DynCorp and Onsite OHS have caused false claims to be made for payment of salaries to thousands of ineligible personnel who are legally not fit for duty to remain in service according to the required terms of the LOGCAP IV contract and MOD 11.

83.     In fact, Pat Dobson, DynCorp Chief of Staff, acknowledged during a recent DynCorp management meeting that DynCorp is "not supposed to be billing the government for these people that are not fit for duty."

84.     Rather than cease payment of these salaries to not fit for duty personnel or discontinue billings to the government, Defendants DynCorp and Onsite OHS have continued this fraudulent scheme of government billing and have conspired to cover up documentation relating to this scheme through the changing of email subject lines as discussed *infra*. Otherwise, as stated by DynCorp's management team, they could get in "a hell of a lot of trouble" if the government learned they were billing for services provided by not fit for duty personnel every month.

85.     In addition, under Task Order 4, Defendants DynCorp and Onsite OHS are submitting false claims for the payment of salaries to medical personnel that, pursuant to the government task order, are required to be trained in CPR and first aid (per OSHA standards). Defendants have failed to train these personnel, but are fraudulently submitting claims to the government for payment of salaries to these medical personnel to work in this capacity. To date,

Defendant DynCorp has still not approved the training of these personnel in CPR and first aid services and will not sign off on the additional cost and resources necessary to do so.

86.     Thus, since 2009, Defendants have submitted million of dollars worth of fraudulent claims/billings for payments of salaries to personnel who are not fit for duty under Task Orders 3 and 4 and/or not trained to provide medical services under Task Order 4.

**Fraudulently Providing Services and Resources to Non-LOGCAP Contracts While Submitting Payment for those Services and Resources under the LOCGAP IV Contract**

87.     Any and all money received from the government under Task Order 4 of the LOGCAP IV contract is for services provided under that contract only.

88.     Defendant Onsite OHS, however, has been knowingly, falsely and fraudulently providing services and resources to other non-LOGCAP contracts while billing under the DynCorp LOGCAP IV contract umbrella.

89.     In fact, Onsite OHS upper management gave instructions to Afghanistan medics that were being transferred from providing services under the LOGCAP IV contract to providing services under other non-LOGCAP contracts to take as many supplies, medications and other resources with them from the LOGCAP IV clinic.

* * *

90.     Overall, therefore, Defendants DynCorp and Onsite OHS have been knowingly defrauding the government out of millions of dollars under Task Orders 3 and 4 of the LOGCAP IV contract since as early as 2009 and continuing into the present.

91.     In addition, in or around February 2009, DynCorp was awarded a task order for support services in another Kuwait Area of Responsibility ("Task Order 2"). Task Order 2 was valued at $77 million for a transition period of one year of full performance and up to an additional four years of options that may be awarded at the discretion of the government. Task

Order 2 requires DynCorp to provide support services in the Kuwait Area of Responsibility, including movement control operations, which involves managing the in-transit logistics and facilities needed for U.S. military personnel to arrive and depart from the Kuwait Area of Responsibility. Under Task Order 2, DynCorp provided base camp services, life support, and operations and maintenance for U.S. governmental facilities, including designated debarkation seaport and airports. Upon information and belief, Onsite OHS was hired by DynCorp as a subcontractor under Task Order 2 to provide medical services to its personnel, including the annual fit for duty examinations. Upon further information and belief, a similar fraudulent scheme was being committed by DynCorp and Onsite OHS under Task Order 2, including, but not limited to: (1) fraudulently receiving payment from the government since 2009 under Task Order 2 of DynCorp's LOGCAP IV contract for annual fit for duty medical examinations of contractor employees that were never provided; and (2) submitting false claims for payment of salaries to contractor employees who are not fit for duty under Task Order 2.

## COUNT I

*(False Claims Act 31 U.S.C. § 3729(a)(1)(A))*

92.     Relator incorporates by reference the allegations set forth in paragraphs 1-91 as though fully set forth herein.

93.     This is a claim for civil penalties and treble damages under the False Claims Act.

94.     By virtue of the acts described above, DynCorp and Onsite OHS knowingly presented, caused to be presented, and continue to present and cause to be presented false or fraudulent claims for payment and reimbursement by the United States Government for the provision of medical services, equipment, and medical facilities under the LOGCAP IV contract which Defendants never provided.

95.     The United States Government, in reliance on the false claims made by DynCorp and Onsite OHS, paid Defendants substantial sums of money to provide services, medical equipment, and medical facilities to civilian contractor employees in Kuwait and Southern Afghanistan which were never provided.

96.     As set forth in the preceding paragraphs, DynCorp and Onsite OHS violated 31 U.S.C. § 3729(a)(1) and have thereby damaged and continue to damage the United States Government by their actions in an amount to be determined at trial.

## COUNT II

*(False Claims Act, 31 U.S.C. § 3729(a)(1)(B))*

97.     Relator incorporates by reference the allegations set forth in paragraphs 1-96 as though fully set forth herein.

98.     By virtue of the acts described above, DynCorp and Onsite OHS knowingly made, used or caused to be made or used, and continue to make or use or cause to be made or used, false records and/or statements to get false or fraudulent claims paid by the United States Government.

99.     The United States Government, in reliance on the false records and/or statements by DynCorp and Onsite OHS, paid Defendants substantial sums of money to provide medical services, medical equipment, and medical facilities to civilian contractor employees in Kuwait and Southern Afghanistan which were never provided.

100.    As set forth in the preceding paragraphs, DynCorp and Onsite OHS violated 31 U.S.C. § 3729(a)(1)(B) and have thereby damaged and continue to damage the United States Government by their actions in an amount to be determined at trial.

### COUNT III

*(False Claims Act, 31 U.S.C. § 3729(a)(1)(C))*

101.    Relator incorporates by reference the allegations set forth in paragraphs 1-100 as though fully set forth herein.

102.    This is a claim for civil penalties and treble damages under the False Claims Act.

103.    By virtue of the acts described above, DynCorp has knowingly conspired with Onsite OHS to defraud the United States Government by certifying that Defendants have provided certain medical services, equipment, and medical facilities to and for the benefit of civilian contractor employees even though such medical services, equipment, and facilities were never provided.

104.    DynCorp's conspiracy with Onsite OHS defrauded the United States Government by getting false and/or fraudulent claims paid worth substantial sums of money to Defendants to provide services, medical equipment, and medical facilities to civilian contractor employees in Kuwait and Southern Afghanistan which were never provided.

105.    As set forth in the preceding paragraphs, DynCorp and Onsite OHS violated 31 U.S.C. § 3729(a)(1)(C) and have thereby damaged and continue to damage the United States Government by their actions in an amount to be determined at trial.

## COUNT IV
*(False Claims Act, 31 U.S.C. § 3729(a)(1)(G))*

106.    Relator incorporates by reference the allegations set forth in Paragraphs 1-105 as though fully set forth herein.

107.    As set forth above, DynCorp and Onsite OHS knowingly made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. §3729(a)(1)(G).

108.    By virtue of the false records or statements by DynCorp and Onsite OHS, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against Defendants as follows:

That this Court enter judgment against DynCorp and Onsite OHS in favor of the United States in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act;

109.    That the Relator be awarded the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d);

110.   That the Relator be awarded all costs and expenses of this action, including attorneys' fees, expenses and costs as permitted by 31 U.S.C. § 3730(d); and

111.   That the United States and Relator receive all such other relief as may be just and proper.

Respectfully submitted,

*Danielle M. D'Addesa*

Gregory M. Utter (*Ohio Bar No.* 0032528)
(*pro hac pending*)
Joseph M. Callow Jr. (*Ohio Bar No.*
0061814) (*pro hac pending*)
Danielle M. D'Addesa (*Ohio Bar No.*
0076513) (*pro hac pending*)
Lori G. Heilman (Ohio Bar. No. 0086533)
(*pro hac pending*)
Keating Muething & Klekamp PLL
Phone: (513) 579-6540
Fax: (513) 579-6457
gmutter@kmklaw.com
jcallow@kmklaw.com
ddaddesa@kmklaw.com
lheilman@kmklaw.com

*Joel Hesch / did*

Joel Hesch (*D.C. Bar No.* 421822)
Attorney at Law
3540 Ridgecroft Dr.
Lynchburg, VA 24503
Phone: (434) 592-4251

*Counsel for Relator, Michael Greer*

## CERTIFICATE OF SERVICE

The undersigned certified that on this 11th day of March 2013, a copy the foregoing Complaint and the required Disclosure Statement were served on the following individuals, via FedEx delivery, at the addresses below:

Hon. Eric H. Holder, Jr.
Attorney General of the United States
950 Pennsylvania Avenue
Room 4400
Washington, D.C. 20530-0001


Hon. Ronald C. Machen, Jr.
United States Attorney
United States Attorney's Office
Justice Center Building
555 Fourth Street, NW
Washington, D.C. 20530

Danielle M. D'Addesa

4757166.8


4757166.7